1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SABEIRA THLANG,

11              Petitioner,              No. CIV S-10-0046 WBS EFB P

12         vs.

13   FRANCISCO JACQUEZ,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16         Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2006 judgment of

18   conviction entered against him in the San Joaquin County Superior Court on charges of first

19   degree murder, with the special circumstance that petitioner was a member of a criminal street

20   gang; assault with a firearm; negligent discharge of a firearm; conspiracy to commit murder; and

21   participation in a criminal street gang.  Petitioner seeks relief on the grounds that: (1) his

22   statements to police should not have been admitted into evidence at his trial because they were

23   involuntary and coerced by a promise of leniency; (2) the trial court violated his right to due

24   process by denying his request to replace a juror who committed misconduct; (3) the trial court

25   violated his right to due process by admitting into evidence information pertaining to a prior

26   juvenile adjudication; (4) the trial court violated his federal constitutional rights by enhancing his

1

sentence based on a prior "strike" conviction; (5) the trial court violated his right to due process by enhancing his sentence based on his prior juvenile record; and (6) his sentence violates his Sixth Amendment right to have all essential facts determined by a jury beyond a reasonable doubt.  Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

## I.   Procedural and Factual Background[1]

After a jury trial, defendant Sanbeira Thlang was found guilty of first degree murder (Pen.Code, §§ 187, 189)[2] and several lesser or related offenses to the murder, as to which sentencing was stayed under section 654.  The jury also found true a special circumstances allegation that the murder was committed while actively participating in a criminal street gang (§ 190.2, subd. (a)(22)) and enhancement allegations that the death was caused by intentional discharge of a firearm (§ 12022.53, subds.(d), (e)(1)), that defendant had a prior serious felony conviction (§ 1170.12), and, as to the stayed offenses, that they were violent felonies committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)).  Sentenced to state prison for life without parole and a consecutive term of 50 years to life, defendant appeals.

Defendant contends that the trial court erred in: (1) admitting (a) evidence of a confession and (b) details of conduct underlying his prior conviction; (2) failing to remove a juror from the jury for misconduct; (3) failing to strike the prior serious felony conviction allegation; (4) imposing upper terms on some sentences, stayed under section 654; and (5) doubling certain enhancement terms as a result of the prior serious felony conviction.  Only the last contention has merit.  We shall modify the judgment regarding the sentence of doubled enhancement terms and affirm it as so modified.

**FACTUAL AND PROCEDURAL BACKGROUND**

A little after midnight on the morning of February 21, 2005, Fortune Johnson, age 55, living near Astor Drive in North Stockton, decided to walk to the store.  On the way, he saw Nath Sok, age 21, to whom he had been introduced a day or so before, come up behind him riding a bicycle.  A Chevrolet Astro van,

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

[2]  Undesignated statutory references are to the Penal Code.

followed in tandem by a Camaro, drove past Johnson and Sok and then, together, the vehicles made a U-turn.  Johnson had seen the same vehicles a half hour to an hour earlier going really fast around the block, when he was sitting out in front of his home.  Uneasy, he began to walk faster.  Sok had stopped about 50 feet behind Johnson.

Johnson witnessed the driver of the van hail Sok and speak to him in a calm voice.  He also saw a number of Asian males get out of the van and the car.  Sok stopped and responded boisterously.  As soon as he did so, there was a fusillade of large-caliber gunshots and Sok was blasted back from his bike.  Johnson took cover behind a car and, after a terrifying interval, the males calmly got back in the vehicles and "just cruised on away slowly on down the street."

About a half hour past midnight, officers of the Stockton Police Department responded to a report of the shooting.  When they arrived they found Sok lying dead on the lawn, next to the bicycle.  He had been shot three times in the head and neck, and once in the penis.  Five .40-caliber shell casings were in the middle of the street and one was next to the bike.

Sok had been documented as a member of the Loc Town Crips (LTC) gang and an associate of the Asian Street Walkers (ASW), another Stockton gang.  The Astor Drive area is part of the territory claimed by the ASW gang.  Tiny Rascal Gang (TRG) is a rival of LTC and ASW and a logical suspect for inter-gang violence.  Defendant had been documented as a member of TRG by his own admission on February 5, 2005.  In 2002 he had admitted a charge of assault with a firearm in a juvenile adjudication arising out of a TRG gang-related shooting where some of the assailants yelled "TRG" at the people who were shot.

The police investigation led to a silver van and a green Camaro on Wednesday, February 23, 2005, at the residence of reputed TRG associates.  When the Camaro was driven away from the residence, officers stopped the car and interrogated the occupants, including S.C.  Inside the car were a grey bandana, TRG's gang color, some compact discs marked TRG, and a disposable camera.  Film from the camera yielded photos of groups of TRG gang members, including defendant, displaying TRG gang signs.  Songs on the compact discs extol TRG gang activities, including drive-by and walk-up shootings of opposing gang's members, e.g., by "creepin' up," driving into other gang's territory at night to catch enemies off guard.

////

////

3

On March 1, 2005, Stockton police detectives went to Seattle, Washington, where the Seattle Police Department had defendant in custody.  After giving a *Miranda*[3] warning they interrogated him.

They explained to defendant that there had been an "incident" down in Stockton and they wanted to hear his side of the story.  He denied gang affiliation.  They said they were investigating a shooting on the 20th or 21st of February:

"You know our, our belief is that out of everybody there you were probably the, the least involved and I don't want to put any words in your mouth.  I got half of the story so I don't want to say you know man I could make up a lot of things.  You could be the guy that planned this whole thing and sent everybody out here to go look for enemies or you could just be the guy that was in the car and you don't know what the hell's going on and somebody starts shooting.  I don't know exactly, I got my own thoughts, my partner has his own thoughts about, about what happened but the only guy that can tell that other side of the story about what you did is you."

The detectives told defendant they had already talked to everyone else and asked him to identify several pictures of persons involved in the shooting incident.

Defendant said he had argued with several of these people on a Sunday.  They were TRG wannabes who tried to involve him in gang activity, but he told them he was out of TRG and wanted no part of it.  "I don't know they prob ... they said he looking for enemies you know what I mean.  Probably jump an enemy you know what I mean.  Beat up an enemy shoot an enemy I don't know you know what I'm saying so I told them I'm cool, I'm straight."  He told them he had already done four years "in some stupid[-]ass shit."  He knew nothing about any shooting.

The detectives implied they had witnesses stating he was involved.  Defendant vigorously maintained he would not be swayed: "I'm going to go with my story."

Defendant then continued: "Like the last time[,] you know what I mean[,] the last time I seen them was the Sunday we had a little bit of argument that was it.  I don't know you know what I'm saying if they trying to bring me up in the mix too with (unintelligible) . . . and all that you know what I'm saying.  I told them, I'm out of the game already, you know what I'm saying.  I'm not doing no mother fucking, no more mother fucking 25 to life for these mother fuckers."

---

[3]  *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

He rejected, over a protracted period, a series of gambits designed
to persuade him to admit he was present at the shooting.

Then, as the detectives were winding up the interview, in the
process of leaving, defendant asked to speak to Detective Youn
Seraypheap, the officer of Cambodian ethnicity, alone.  Detective
Seraypheap agreed.  The following comments by Detective
Seraypheap ensued:

"I'm telling you thing is . . . listen, listen I don't think you were the
shooter to be honest with you.  I'm, I'm being honest.  I don't
think you were the shooter okay.  I think you were just sitting in
the Camaro and other people shot and you said oh fuck take me
home okay after it happened.  But it's going to hurt you because
you're sitting here saying that you weren't in [the] Camaro you
understand that.  That's all I'm telling you.  That's all I'm trying to
get out of you is that you know what I'd rather have you okay tell
me the truth.  Be a witness rather than be a suspect in this thing
you understand that. [¶] . . . [¶]

"[I] mean I, I, I swear it on my two kids.  [¶] . . . [¶]  Okay, the
thing is it doesn't matter, it is matter you know at this point it
doesn't matter what you think or what you say it's what other
people say you understand that.  [¶] . . . [¶]

"The thing is um, you know I, I don't want to see you go to prison
man I'm not lying to you.  You know I didn't fly all over here for
nothing.  The thing is that you know I know, I know I'm not.  I
know for a long time since he was a kid.  I know (unintelligible) . .
. when he got shot you know I was there.  I know his dad, I've
known him for twenty years okay.  I talk to (unintelligible) . . . dad
before I came out here and I know everything (unintelligible) . . .
not at first to lie to me that he wasn't there in Stockton
(unintelligible) . . . I told him (unintelligible) . . . give me a little
respect because I know, I do my homework before I come
(unintelligible).  I been working on this case since it happened and
I truly, truly think you weren't the shooter okay.  I know exactly
who shot alright [ sic ] but I, I, I can't do anything for you when
you're sitting here telling to me I wasn't in the Camaro when in
fact everybody knows you were[,] you understand that.  I truly
don't think you were the shooter and I want you, I'd rather use you
as a witness than, than, than a suspect you know what I mean.  I
mean you can argue with me all you want you can . . . ."

Thereafter, following additional conversation, defendant admitted
he was sitting in the Camaro when the shooting happened and he
identified the other occupants of the vehicles.  He maintained that
he had no idea that the shooting was likely to occur.

S.C., age 13 at the time of the shooting, testified as follows:  He
was seated behind defendant in the Camaro, on the passenger side.

He got out of the car and shot the victim, Sok.  When he returned to the car he handed the weapon back to defendant, who placed it under his seat.  Before the vehicles commenced the fatal journey, he and the others had discussed looking for an enemy "slippin'," i.e., leaving himself vulnerable to attack.

Two other occupants of the vehicles discharged firearms during the incident.

Reachhetra Pheng, a codefendant, testified, in part, as follows:  On the night of the shooting, he was partying in a garage with defendant and two others.  Three other males showed up; someone said, "let's roll" and everybody left.  Pheng was the last one to walk out; the Camaro was full, so he got in the van.  The van took the lead, the Camaro followed.  When they "busted a U" and "rolled up" on Sok, he heard gunshots, thought they were being shot at, and ducked for cover in the back seat.

Resp.'s Lodg. Doc. B (hereinafter Opinion), at 1-8.

## II.    Analysis

### A.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

////

6

1        (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
2        State court proceeding.

3      For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

4  holdings of the United States Supreme Court at the time of the state court decision.  *Stanley v.*

5  *Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06

6  (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is

7  clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d

8  at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010))

9      A state court decision is "contrary to" clearly established federal law if it applies a rule

10 contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

11 precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

12 Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

13 the writ if the state court identifies the correct governing legal principle from the Supreme

14 Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4]

15 *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

16 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

17 simply because that court concludes in its independent judgment that the relevant state-court

18 decision applied clearly established federal law erroneously or incorrectly.  Rather, that

19 application must also be unreasonable."  *Williams*, 529 U.S. at 412.  *See also Schriro v.*

20 *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

21 habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

22 the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

23 precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

---

24      [4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be
25 overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
   presented in the state court proceeding."  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011)
26 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1   of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

2   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

3   condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

4   state court's ruling on the claim being presented in federal court was so lacking in justification

5   that there was an error well understood and comprehended in existing law beyond any possibility

6   for fairminded disagreement." *Harrington*,131 S. Ct. at 786-87.

7       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

8   court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

9   527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

10  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

11  2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

12  considering de novo the constitutional issues raised.").

13      The court looks to the last reasoned state court decision as the basis for the state court

14  judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

15  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

16  previous state court decision, this court may consider both decisions to ascertain the reasoning of

17  the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

18  a federal claim has been presented to a state court and the state court has denied relief, it may be

19  presumed that the state court adjudicated the claim on the merits in the absence of any indication

20  or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85.  This

21  presumption may be overcome by a showing "there is reason to think some other explanation for

22  the state court's decision is more likely." *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

23  803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to

24  support its conclusion, a federal habeas court independently reviews the record to determine

25  whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.*

26  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

8

review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

### B. Petitioner's Claims

#### 1. <u>Statements to Police</u>

In his first ground for relief, petitioner claims that his statements to police should not have been admitted into evidence at his trial because they were involuntary and coerced by a promise of leniency. He alleges that Detective Seraypheap told him he would "only be a witness if he had merely been present but had not been a shooter." Dckt. No. 1 at 18. Petitioner states that he understood this to mean that if he confessed to his role in the crimes, and if he was not the shooter, he would be a witness in this case instead of a suspect. *Id.* He explains:

> [Petitioner] had three choices at this point per Detective Seraypheap: (1) continue to deny he was present at the shooting, (2) admit he was present but deny he was a shooter, or (3) admit he was a shooter. Continuing to deny his presence or stating he was the shooter meant he would remain in custody as a suspect while the second option would result in being a mere witness and not suspect and his release from custody . . . that [he] then chose the second option is hardly surprising after these inducements to gain his freedom by doing so.

*Id.* at 19. Petitioner claims that he was "literally promised his freedom if he admitted to only being present at the shooting." *Id.* at 21. He argues, "if [he] had himself not pulled the trigger of a gun and had only been present he was promised leniency. The leniency followed if he disclosed his role in the matter and was threatened with life in prison if he did not." *Id.* at 22.

////

The California Court of Appeal rejected these arguments, reasoning as follows:

**I. No Error in the Admission of Defendant's Allegedly "Coerced" Confession**

Defendant contends the trial court erred in admitting into evidence his statements to the detectives who interrogated him in Seattle. He argues that his statements after Detective Seraypheap urged him to be a witness rather than a suspect were involuntary and inadmissible because this was an implied promise of benefit or leniency which induced him to admit he was present at the shooting. In his view, the witness/suspect dichotomy was a false representation that admitting he was present "would result in his being a mere witness and not a suspect and his release from custody." The Attorney General replies that no such representation was made, as the remark, in context, was only an admonition that telling the truth about his presence at the scene could confer a tactical benefit. The Attorney General has the more persuasive argument and the contention of error lacks merit.

"'It is axiomatic that the use in a criminal prosecution of an involuntary confession constitutes a denial of due process of law under both the federal and state Constitutions . . . . In California, before a confession can be used against a defendant, the prosecution has the burden of proving that it was voluntary and not the result of any form of compulsion or promise of reward.' [Citation.] . . . [T]he voluntariness of the statements must 'be proved by a preponderance of the evidence at trial.' [Citation.] In the absence of conflicting testimony, we 'examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat.'" (*People v. Cahill* (1994) 22 Cal.App.4th 296, 310.) Where there is a claim that a statement is involuntary because of a false promise of leniency, "The line 'can be a fine one' (*People v. Thompson* (1990) 50 Cal.3d 134, 169) between urging a suspect to tell the truth by factually outlining the benefits that may flow from confessing, which is permissible, and impliedly promising lenient treatment in exchange for a confession, which is not." (*People v. Holloway* (2004) 33 Cal.4th 96, 117 (*Holloway*).)

The trial court carefully analyzed this in its ruling on admissibility and concluded that, "while the bare words themselves could raise a valid argument of implied promise, taken in the context of the entire interview and based on the totality of the circumstances, [the argument is not persuasive]." We agree.

As the trial court noted, defendant was strong-willed and was sophisticated about the nature of police interrogation tactics in a serious case. Detective Seraypheap had earlier told him that

regardless of whether he did the shooting or not, "I'll tell you this right now, you can't get off the hook.  You have to answer to it." After making the witness/suspect remark and before the incriminating admission, the detective told defendant that denying he was present "hurt[s] your case more."  This, too, implies that there will be a case against defendant regardless of an admission of presence.

There is no inkling in defendant's behavior after the admission that he thinks he may have a bargain to be treated as a mere witness.  In his statements he was careful to affirmatively assert that he just went along for a ride, indicating he was aware that he could be criminally liable even if he was not a shooter.

"[DEFENDANT]: The next you know bam, bam, bam, bam.  I didn't know nothing.  I just look up what the fuck you know what I mean.

"Detective Seraypheap: Uh-huh.

"[DEFENDANT]: What happened you know what I'm saying.

"Detective Seraypheap: Uh-huh.

"[DEFENDANT]: Wow I just went inside the car (unintelligible) . . . I mean I sat, I sat in the car (unintelligible) . . . dropped me off at home.

"Detective Seraypheap: Uh-huh.

"[DEFENDANT]: But then my girl came and then I told my girl I'm like you know what I mean.

"Detective Seraypheap: Uh-huh.

"[DEFENDANT]: They said this and that but . . . you know what I mean I don't . . . I didn't really know what's cracking."

In *Holloway*, the Supreme Court reasoned as follows: "[S]uggestions that the killings might have been accidental or resulted from an uncontrollable fit of rage during a drunken blackout, and that such circumstances could 'make[ ] a lot of difference,' fall far short of being promises of lenient treatment in exchange for cooperation.  The detectives did not represent that they, the prosecutor or the court would grant [the] defendant any particular benefit if he told them how the killings happened.  To the extent [the police officer's] remarks implied that giving an account involving blackout or accident might help [the] defendant avoid the death penalty, he did no more than tell [the] defendant the benefit that might '"flow[ ] naturally from a truthful and honest course of conduct"' (*People v. Jimenez* [ (1978) ] 21 Cal.3d [595],

612[, *overruled on a different ground* in *Cahill, supra*, 5 Cal.4th at pp. 509-510, fn. 17] ), for such circumstances can reduce the degree of a homicide or, at the least, serve as arguments for mitigation in the penalty decision.  As the appellate court explained in *People v. Andersen* [ (1980) ] 101 Cal.App.3d [563,] 583, 'Homicide does possess degrees of culpability, and when evidence of guilt is strong, confession and avoidance is a better defense tactic than denial.'" (*Holloway, supra*, 33 Cal.4th at p. 116.)

In this case there was strong evidence that defendant was at the scene of the shooting.  If he nonetheless denied he was present, it could strengthen an implication of mens rea.  If he admitted he was present, he could claim to be a mere witness, unaware of the intent of the shooter.  This would avoid loss of credibility in contradicting evidence that he was present.  This was a benefit that might flow naturally from a truthful and honest course of conduct.  In context, this was the import of Detective Seraypheap's suspect/witness remark.

We do not believe that the remark was, or that defendant took it as, an assurance that admitting he was present "would result in his being a mere witness and not a suspect and his release from custody."  Even if the mention that defendant could be viewed as a witness was problematic, Detective Seraypheap's statement is not attributable to an implied promise.  Considering all the circumstances of this case, no improper coercion (by suggesting that defendant could benefit from giving a truthful, mitigated account of the shooting incident) caused him to admit he was present.

Opinion at 8-13.

The Constitution demands that confessions be made voluntarily.  *See Lego v. Twomey*, 404 U.S. 477, 483-85 (1972).  A confession is voluntary only if it is "'the product of a rational intellect and a free will.'"  *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)).  *See also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."  *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  Voluntariness is to be determined in light of the totality of the circumstances.  *See Miller v. Fenton*, 474 U.S. 104, 111 (1985); *Haynes v. Washington*, 373 U.S.

503, 513 (1963).  The factors to be considered include "the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age."  *Brown v. Horell*, ___ F.3d ___, No. 09-16643, 2011 WL 2685580 (9th Cir. July 12, 2011).  In the end, the court must determine whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  *Beaty v. Stewart*, 303 F.3d 975, 992 (9th Cir. 2002) (quoting *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).  *See also Hutto v. Ross*, 429 U.S. 28, 30 (1976).

Officials cannot extract a confession "by any sort of threats or violence, nor . . . by any direct or implied promises, however slight, nor by the exertion of any improper influence."  *Hutto*, 429 U.S. at 30 (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).[5]  Neither physical intimidation nor undue psychological pressure is permissible.  *United States v. Haswood*, 350 F.3d 1024, 1027 (2003).  *See also Miranda v. Arizona* , 384 U.S. 436, 476 (1966) ("any evidence that the accused was threatened, tricked, or cajoled into a waiver (of Fifth Amendment right to remain silent) will, of course, show that the defendant did not voluntarily waive his privilege"); *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) ("subtle psychological coercion suffices . . . at times more effectively 'to overbear a rational intellect and a free will'").  On the other hand, "if interrogators obtained a confession after *Miranda* warnings and a valid waiver, the confession was likely voluntary."  *DeWeaver v. Runnels*, 556 F.3d 995, 1003 (9th Cir. 2009).  Further, "in most circumstances, speculation that cooperation will benefit the defendant or even promises to recommend leniency are not sufficiently compelling to overbear a defendant's will."  *United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994).

////

---

[5]  This broadly-stated rule has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel.  Rather, the promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances.  *See Hutto*, 429 U.S. at 30.

1      After reviewing the transcript of petitioner's interrogation,[6] this court agrees with the

2  California Court of Appeal that petitioner's statements to police were not coerced by the

3  comments of Detective Seraypheap, set forth above.  In essence, the detective was informing

4  petitioner that insisting he wasn't at the scene at all, when that clearly was not the truth, would

5  result in a tactical disadvantage to him or "hurt [his] case more."  CT at 981.  Specifically,

6  Seraypheap stated, "But it's going to hurt you because you're sitting here saying that you

7  weren't in [the] Camaro you understand that.  That's all I'm telling you." *Id.*  at 978.  At no time

8  did the detective tell petitioner he would be released from custody, or gain his freedom, by

9  confessing to his role in the crime, nor did he tell him that his role would be limited to being a

10  trial witness if he confessed to being in the Camaro.  On the contrary, as noted by the state

11  appellate court, Detective Seraypheap had previously warned petitioner that could not "get off

12  the hook" and that he had "to answer for it" even if he was not the shooter.  Opinion at 10.

13  Certainly there is no evidence petitioner was coerced to confess to a crime he did not commit,

14  that he was intimidated or worn down, or that his governing self-direction was lost.

15      The California Court of Appeal concluded that Detective Seraypheap was simply

16  informing petitioner that he could gain tactical benefits by dropping his implausible insistence

17  that he wasn't in the Camaro, and that this advice did not render petitioner's statements

18  involuntary or coerced.  This conclusion is not based on an unreasonable determination of the

19  facts of this case, nor is it contrary to or an unreasonable application of the federal authorities set

20  forth above.  Detective Seraypheap's suggestion that cooperation would benefit petitioner was

21  insufficient to overbear petitioner's will.  *Harrison*, 34 F.3d at 891.  Because petitioner has failed

22  to demonstrate that his statements to police were involuntary or coerced, he is not entitled to

23  relief on this claim.

24  ////

25

26      [6] *See* Clerk's Transcript on Appeal (CT) at 940-99.

14

## 2. **Biased Juror**

In petitioner's next ground for relief, he claims that the trial court violated his right to due process when it rejected his request to remove a juror who committed misconduct during the course of deliberations.  Dckt No. 1 at 24-28.   The California Court of Appeal explained the background to this claim and its reasoning thereon as follows:

### III. Trial Court Did Not Err in Failing to Remove Juror No. 7

Defendant contends that the trial court erred in failing to remove Juror No. 7 (the foreman) during deliberations.  He argues that the juror committed prejudicial misconduct in informing the other jurors that he had found a .22-caliber bullet placed standing on the hood of his car when he left the courthouse at the end of the day. We reject the argument, as the contention of error has no merit.

When the juror returned to court the day after finding the bullet, he told the bailiff and the other jurors about the incident, "because I look out for them.  I mean, we should all look out for each other." Defense counsel moved that the jury foreman be removed from the jury.  He argued that a reasonable person would be intimidated by such an event and that it would affect the juror's opinion of the case.  After interviewing each of the jurors separately, the court found that the incident would not affect their ability to be fair and impartial and denied the motion.

Later that day, defense counsel moved for a mistrial on the ground that because of the incident, the jurors "are going to react to this by saying, 'Hey, we better lock this guy up.'"  The trial court denied the motion on the ground it was convinced from its discussion with the jurors that the incident would not affect their ability to be fair and impartial.  Counsel thereafter commented that, in his opinion, Juror No. 7's disclosure of the incident to the other jurors was misconduct.

The claim of misconduct tendered at trial is based on receipt of evidence from an extraneous source.  Even though a juror does nothing improper, inadvertent receipt of information outside the court proceedings is considered "misconduct" and creates a presumption of prejudice. (*People v. Zapien* (1993) 4 Cal.4th 929, 994.)  "To summarize, when misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial.  The verdict will be set aside only if there appears a substantial likelihood of juror bias.  Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.  [Citations.]  Second, we look to the nature of

15

the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter* (1995) 9 Cal.4th 634, 653.)

The "evidence" here was an implied threat of violence to Juror No. 7, the jury foreman. First, we do not find the threat inherently and substantially likely to have influenced the juror. The contrary view is implicit in the broad discretion given trial judges to deal with such situations. (*See Annot., Threats of Violence Against Juror in Criminal Trial as Ground for Mistrial or Dismissal of Juror* (1992) 3 A.L.R.5th 963.) Second, the nature of the misconduct and the surrounding circumstances do not compel a finding that it is substantially likely the juror was actually biased against defendant.

The trial court has the discretion under section 1089 to remove a juror for serious and willful misconduct. The trial court carefully questioned each juror and determined each was able to continue to perform the duty of a juror. Neither the innocent receipt of the threat "evidence" nor the alerting of the other jurors show serious and willful misconduct on the part of the juror who found the bullet. There is no compelling indication that he intended to violate any instruction of the court, hence no inference he was untrustworthy. (*Cf. People v. Daniels* (1991) 52 Cal.3d 815, 864 .) The trial court did not err in failing to remove Juror No. 7.

Opinion at 15-17.

Under the Sixth Amendment, a criminal defendant has the right to be tried by an impartial jury and to confront and cross-examine the witnesses who testify against him. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). Jurors are objectionable if they have formed such deep and strong impressions that they will not listen to testimony with an open mind. *Irvin*, 816 U.S. at 722 n.3. A defendant is also entitled to a jury that reaches a verdict only on the basis of evidence produced at trial. *Turner v. Louisiana*, 379 U.S. 466 (1965); *Estrada v. Scribner*, 512 F.3d 1227, 1238 (9th Cir. 2008); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court."). The introduction of prejudicial extraneous influences into the jury room constitutes misconduct which may result in the reversal of a conviction. *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966).

1   On collateral review, trial errors, such as extraneous information that was considered by

2   the jury, "are generally subject to a 'harmless error' analysis, namely, whether the error had

3   'substantial and injurious' effect or influence in determining the jury's verdict." *Jeffries v.*

4   *Wood*, 114 F.3d 1484, 1491 (9th Cir. 1997)), *overruled on other grounds* by *Lindh v. Murphy*,

5   521 U.S. 320 (1997) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).  *See also Cook v.*

6   *LaMarque*, 593 F.3d 810, 827 (9th Cir. 2010) (citing factors to be considered in making the

7   harmless error determination); *Estrada*, 512 F.3d at 1235; *Brown v. Ornoski*, 503 F.3d 1006,

8   1018 (9th Cir. 2007); *Fields v. Brown*, 431 F.3d 1186, 1209 n.16 (9th Cir. 2005) (noting that

9   *Brecht* provides the standard of review for harmless error in cases involving unconstitutional

10  juror misconduct).  "[T]he Supreme Court has stressed that the remedy for allegations of jury

11  bias is a hearing, in which the trial court determines the circumstances of what transpired, the

12  impact on the jurors, and whether or not it was prejudicial." *United States v. Dutkel*, 192 F.3d

13  893, 899 (9th Cir.1999) (internal quotation marks omitted).

14      Assuming arguendo that Juror No. 7 committed misconduct in telling the other jurors

15  about the bullet he found on the hood of his car, the misconduct was harmless.  The trial court

16  interviewed all of the jurors about the incident, including Juror No. 7, and all of them assured the

17  court that it would not affect their ability to be impartial.  Reporter's Transcript on Appeal (RT)

18  at 1514-15, 1525-46.[7]  Juror No. 7 expressed the opinion that "no-one is uncomfortable and

19  nothing has changed because of what has happened." *Id.* at 1519-20.  The court admonished the

20  jurors not to discuss the matter further. *Id.*  Finally, the jury was instructed to base its decision

21  on the facts and the law as stated by the judge. *Id.* at 1357.  The court presumes that jurors

22  follow the instructions given, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and there is no

23

24          [7] One juror expressed concern about having been stared at in the court hallway by
    relatives of one of petitioner's co-defendants.  RT at 1534.  It appears that the relatives were sent
25  home as a result. *Id.* at 1535.  This incident was unconnected with the bullet found on Juror No.
    7's car.  In any event, when asked whether any of these events would affect him, the juror
26  responded, "Not at all, no way." *Id.*

evidence in the record that the jury failed to do so here.  Under the circumstances of this case, petitioner has failed to demonstrate that juror misconduct had a substantial and injurious effect or influence on the verdict.  Accordingly, he is not entitled to habeas relief.

### 3.  Erroneous Admission of Evidence

In his third ground for relief, petitioner claims that the trial court violated his right to due process and a fair trial by admitting into evidence information pertaining to his prior juvenile court adjudication for assault with a firearm.  Dckt. No. 1 at 29.  He argues, "by permitting this evidence, an open door was provided to bad character evidence proscribed by the federal constitution and state statutes, and effectively reduced the prosecution's burden of proof on the substantive offenses."  *Id.* at 29-30.  Petitioner also argues that any relevance this evidence may have had was substantially outweighed by its prejudicial effect.  *Id.* at 30.  He states, "given the abundance of other evidence available to prove the gang issues, it was not necessary that the prior conviction, especially its details be used for this purpose."  *Id.* at 31.

The California Court of Appeal rejected these arguments, reasoning as follows:

**II. No Error in the Admission of Details of Defendant's Prior Juvenile Adjudication**

Defendant contends the trial court erred in ruling admissible, notwithstanding his objection under Evidence Code section 352, evidence of details of the offense underlying his prior juvenile court adjudication.  He argues that the danger of undue prejudice substantially outweighed the probative value of that evidence.  The argument is unpersuasive and the contention of error has no merit.

At the outset of trial, the prosecution asked for an in limine ruling that evidence about the prior adjudication was admissible to show: a predicate gang offense; knowledge or intent that defendant's ride-along in the TRG tandem was facilitating a crime; and gang membership.

Under Evidence Code section 1101, evidence that a person committed a crime can be adduced regardless of propensity to show bad character, when relevant to prove motive, intent, plan, or knowledge.  The trial court decided that the evidence of the details of the prior adjudication was relevant to defendant's motive and intent, because the critical issue in this case was his state of mind-whether he knew "what was going on."  The court

18

acknowledged that this evidence had a danger of undue prejudice, but concluded its relevancy outweighed the prejudicial effect.

The question is whether the trial court abused its discretion. The scope of appellate review of trial court discretion is variable. (*See generally City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298.) Formerly, appellate courts exercised a broader scope of review of decisions in criminal proceedings admitting potentially prejudicial evidence (*see, e.g., People v. Beagle* (1972) 6 Cal.3d 441, 451-453), revisiting the exercise of such discretion to promulgate common law standards for the range of discretion in particular contexts. However, under the California Constitution, article I, section 28, such free-ranging appellate intervention is no longer available. (*See People v. Castro* (1985) 38 Cal.3d 301.) We must uphold the exercise of discretion under Evidence Code section 352 unless the result is undeniably unreasonable, i.e., such that no jurist could reasonably maintain that the application of the governing principles warrants the result reached by the trial court. (*Cf. People v. Muldrow* (1988) 202 Cal.App.3d 636, 643-644.)

Evidence that defendant had previously participated in a TRG drive-up shooting has strong probative value to show that he was aware of the criminal intent of the other TRG members on the night of the charged offense and that he intended to aid or encourage them in a criminal enterprise. His defense, as he related in his statement, was that he had no such intent, he was surprised by the shooting: "I didn't really know what's cracking." When evidence bears on such matters and they are significantly in dispute, it is substantially probative. (*See People v. Ewoldt* (1994) 7 Cal.4th 380, 406.) The trial court did not abuse its discretion in ruling the details of defendant's prior offense were not substantially outweighed by the danger of undue prejudice.

Opinion at 13-15.

As explained above, a federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law. *Wilson,* 131 S. Ct. at 16. Absent some federal constitutional violation, a violation of state law does not provide a basis for habeas relief. *Id.* Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). Even so, as the Ninth Circuit has observed:

////

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ

*Holley*, 568 F.3d at 1101. Therefore, "under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Id.* On the basis of these authorities, the state court's rejection of petitioner's due process claim here does not support habeas relief under AEDPA. The admission of evidence regarding petitioner's prior juvenile adjudication did not violate any right clearly established by United States Supreme Court precedent. *Id.*

Similarly, the United States Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes." *Garceau v. Woodford*, 275 F.3d 769, 774 (9th Cir. 2001), *overruled on other grounds* by *Woodford v. Garceau*, 538 U.S. 202 (2003). In fact, the Supreme Court has expressly left open this question. *See Estelle v. Mcguire*, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). *See also Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (holding that state court had not acted objectively unreasonably in determining that the propensity evidence introduced against the defendant did not violate his right to due process); *Alberni v. McDaniel*, 458 F.3d 860, 863-67 (9th Cir. 2006), *cert. denied*, 549 U.S. 1287 (2007) (denying the petitioner's claim that the introduction of propensity evidence violated his due process rights under the Fourteenth Amendment because "the right [petitioner] asserts has not been clearly established by the

1   Supreme Court, as required by AEDPA"); *United States v. LeMay*, 260 F.3d 1018 (9th Cir.

2   2001) (Fed. R. Evid. 414, permitting admission of evidence of similar crimes in child

3   molestation cases, under which the test for balancing probative value and prejudicial effect

4   remains applicable, does not violate the due process clause).  In short, because the state court's

5   rejection of petitioner's due process claim is not contrary to any United States Supreme Court

6   precedent, petitioner is not entitled to habeas relief on this claim.

7          Petitioner's claims would also fail under Ninth Circuit precedent.  Under Ninth Circuit

8   law, the admission of "other acts" evidence violates due process only if there were no

9   permissible inferences the factfinder could have drawn from the evidence.  *See McKinney v.*

10  *Rees*, 993 F.2d 1378, 1381 (9th Cir. 1993) (question is "whether any inferences relevant to a fact

11  of consequence may be drawn from each piece of the evidence, or whether they lead only to

12  impermissible inferences about the defendant's character"); *Jammal*, 926 F.2d at 920

13  ("[e]vidence introduced by the prosecution will often raise more than one inference, some

14  permissible, some not; we must rely on the jury to sort them out in light of the court's

15  instructions").  *See also LeMay*, 260 F.3d at 1027 (evidence of prior similar crimes "will only

16  sometimes violate the constitutional right to a fair trial, if it is of no relevance, or if its potential

17  for prejudice far outweighs what little relevance it might have").  Here, as explained by the state

18  appellate court, the challenged evidence was probative to show that petitioner "was aware of the

19  criminal intent of the other TRG members on the night of the charged offense and that he

20  intended to aid or encourage them in a criminal enterprise."  Opinion at 14-15.  This was a

21  permissible inference the jury could draw from evidence of petitioner's prior juvenile

22  adjudication that did not involve petitioner's propensity to commit a gang-related crime.  Under

23  these circumstances, any error in admitting evidence of petitioner's prior juvenile adjudication

24  did not result in a due process violation.  Nor did it have "a substantial and injurious effect or

25  influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.  *See also Penry v.*

26  *Johnson*, 532 U.S. 782, 793-96 (2001).

For all of the reasons set forth above, petitioner is not entitled to habeas corpus relief on this claim.

### 4.  Sentencing Claims

#### a.  Increase in Sentence Based on Prior Strike

In his next ground for relief, petitioner claims that the trial court violated his federal constitutional rights when it increased his sentence on the enhancements based on his prior "strike" conviction.  Respondent conceded this claim on direct appeal and the state appellate court modified petitioner's sentence accordingly, reasoning as follows:

> **VI. Increasing the Sentences for Enhancements Because of Defendant's Prior Strike Was Error**
>
> Defendant contends that the trial court erred in doubling his enhancements because of the prior strike.  (*People v. Dominguez* (1995) 38 Cal.App.4th 410, 424; *accord, People v. Hardy* (1999) 73 Cal.App.4th 1429, 1433.)  The Attorney General concedes the point.  We accept the concession.
>
> **DISPOSITION**
>
> The judgment is modified to reflect a sentence of life imprisonment with the possibility of parole with a minimum term of 25 years on the section 12022.53, subdivision (d) enhancement to count 1 and 10 years for the section 186.22, subdivision (b)(1)(C) enhancements on the stayed counts 2 and 3.  The trial court is directed to send a certified copy of an amended abstract of judgment to the Department of Corrections and Rehabilitation in accordance with this modification.  As so modified, the judgment is affirmed.

Opinion at 20-21.

Because petitioner has obtained the relief he is requesting, this claim must be denied as moot.  *See, e.g., Kittel v. Thomas*, 620 F.3d 949, 951–52 (9th Cir. 2010) (habeas petition properly dismissed as moot where there was no legal issue remaining for the court to decide); *United States v. Brandau*, 578 F.3d 1064, 1067 (9th Cir. 2009) (quoting *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002)) ("Where the activities sought to be enjoined already have occurred, and the appellate courts cannot undo what has already been done, the

1    action is moot, and must be dismissed.")

2                          **b.  Apprendi Violation**

3           In his next ground for relief, petitioner claims that the trial court violated his right to due

4    process by using his prior juvenile adjudication to enhance his sentence.  Dckt. No. 1 at 35-36.

5    Citing *United States v. Tighe*, 266 F.3d 1187 (9th Cir. 2001), petitioner argues that because he

6    was not afforded the right to a jury trial on his prior juvenile adjudication, the trial court violated

7    the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) when it

8    "increased [his] sentence beyond the prescribed statutory maximum . . . based upon that prior

9    juvenile adjuciation."  *Id.* at 36.

10          The California Court of Appeal rejected this contention, reasoning as follows:

11              **IV. Prior Juvenile Adjudication May Be Used to Enhance
                 Defendant's Sentence**
12
13              Defendant contends that the trial court erred in allowing the use of
                his juvenile adjudication for assault with a deadly weapon as a
                prior strike.  He relies on the decision of the Court of Appeals for
14              the Ninth Circuit in *United States v. Tighe* (9th Cir.2001) 266 F .3d
                1187.  *Tighe* reasons that a prior nonjury juvenile adjudication
15              cannot be used to increase the penalty beyond that authorized for
                the current offense alone, finding that under *Apprendi v. New*
16              *Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] a "prior conviction"
                can be so used only if "obtained through proceedings that included
17              the right to a jury trial and proof beyond a reasonable doubt."
                (*Tighe, supra*, at p. 1194; *see also id.* at p. 1197.)  As defendant
18              acknowledges, this court has rejected the *Tighe* view in *People v.*
                *Palmer* (2006) 142 Cal.App.4th 724, 727.  *Palmer* is supported by
19              the rejection in *People v. Black* (2007) 41 Cal.4th 799, 819,
                footnote 8 (*Black II*) of the claim that the federal right to jury trial
20              includes the right to a jury determination on prior conviction
                allegations.  We follow *Palmer* and find the contention of error
21              lacks merit for the reasons given therein.

22   Opinion at 18.

23          A criminal defendant is entitled to a trial by jury and to have every element necessary to

24   sustain his conviction proven by the state beyond a reasonable doubt.  U.S. CONST. amends. V,

25   VI, XIV.  In *Apprendi* the United States Supreme Court held that the Due Process Clause of the

26   Fourteenth Amendment requires any fact other than a prior conviction that "increases the penalty

                                               23

1    for a crime beyond the prescribed statutory maximum" to be "submitted to a jury and proved

2    beyond a reasonable doubt."  530 U.S. at 490.  The Supreme Court has not defined the scope of a

3    "prior conviction" and circuit courts are split on whether or not prior non-jury juvenile

4    adjudications are convictions for the purposes of the *Apprendi* prior conviction exception.

5         The Ninth Circuit concluded in *Tighe* that non-jury juvenile adjudications do not fall

6    within *Apprendi*'s exception for prior convictions.  The court explained that:

7              [T]he "prior conviction" exception to *Apprendi*'s general rule must
               be limited to prior convictions that were themselves obtained
8              through proceedings that included the right to a jury trial and proof
               beyond a reasonable doubt.  Juvenile adjudications that do not
9              afford the right to a jury trial and a beyond-a-reasonable-
               doubt burden of proof, therefore, do not fall within *Apprendi*'s "prior
10             conviction" exception.

11   266 F.3d at 1194.  However, all other circuits to have considered this question have ruled the

12   other way.  *See, e.g., United States v. Matthews*, 498 F.3d 25, 36 (1st Cir. 2007) ("For purposes

13   of *Apprendi*'s recidivism exception, we see no distinction between juvenile adjudications and

14   adult convictions; both reflect the sort of proven prior conduct that courts historically have used

15   in sentencing"); *United States v. Crowell*, 493 F.3d 744, 750-51 (6th Cir. 2007) ("We now

16   explicitly hold that the use of procedurally sound juvenile adjudications as [Armed Career

17   Criminal Act] predicates does not violate due process"); *United States v. Burge*, 407 F.3d 1183,

18   1186 (11th Cir. 2005) ("The term 'conviction' includes a finding that a person has committed an

19   act of juvenile delinquency involving a violent felony"); *United States v. Jones*, 332 F.3d 688,

20   696 (3d Cir. 2003) ("A prior nonjury juvenile adjudication that was afforded all

21   constitutionally-required procedural safeguards can properly be characterized as a prior

22   conviction for *Apprendi* purposes"); *United States v. Smalley*, 294 F.3d 1030, 1033 (8th Cir.

23   2002) (the absence of the right to a jury trial does not automatically disqualify juvenile

24   adjudications for purposes of the *Apprendi* exception).  The California state courts have

25   disagreed with the Ninth Circuit interpretation of "prior conviction," adopting instead the

26   interpretation of the Third, Eighth, and Eleventh Circuits.  *See, e.g., People v. Bowden*, 102

24

1   Cal.App.4th 387, 391-94 (2002).

2         The Ninth Circuit has squarely addressed the applicability of the decision in *Tighe* on

3   federal habeas review, concluding that because three other federal circuits have disagreed with

4   the narrow interpretation of the prior conviction exception adopted in *Tighe,* and because the

5   United States Supreme Court has not ruled on the question of whether a juvenile record

6   constitutes a "prior conviction" in this context, a state court decision affirming the use of a

7   juvenile adjudication as a sentencing enhancement cannot be characterized as contrary to clearly

8   established Supreme Court precedent.  *Boyd v. Newland*, 467 F.3d 1139, 1152 (9th Cir. 2006).

9   The *Boyd* court explained:

10              in the face of authority that is directly contrary to *Tighe*, and in the
                absence of explicit direction from the Supreme Court, we cannot
11              hold that the California courts' use of Petitioner's juvenile
                adjudication as a sentencing enhancement was contrary to, or
12              involved an unreasonable application of, Supreme Court precedent.

13   467 F.3d at 1152.  *Id.*  The holding in *Boyd* remains the law of the Ninth Circuit with respect to

14   the issue presented by petitioner here.  *See Kessee v. Mendoza-Powers*, 574 F.3d 675, 677-78

15   (9th Cir. 2009) (affirming reasoning in *Boyd*); *Vargas v. Hedgpeth*, No. Civ. S-09-1697 GEB

16   GGH P, 2010 WL 3521919, at **13-14 (E.D. Cal. Sept. 8, 2010) (relying on the decision in

17   *Boyd* in rejecting petitioner's federal habeas claim that his sentence was unconstitutionally

18   enhanced by juvenile adjudications.)  Accordingly, petitioner is not entitled to relief on this

19   claim.

20                          c.  **Violation of Sixth Amendment**

21         In imposing the upper term on Counts 2 and 3, the sentencing judge relied on several

22   aggravating factors: that the victim was particularly vulnerable; that the manner in which the

23   crime was carried out involved planning and sophistication; that the crime involved violent

24   conduct which posed a serious danger to society; and that petitioner's prior convictions as an

25   adult were numerous or of increasing seriousness.  RT at 1604.  Citing *Blakely v. Washington*,

26   524 U.S. 292 (2004) and *Cunningham v. California*, 549 U.S. 270 (2007), petitioner claims that

1    his sentence violates the Sixth Amendment because some or all of these aggravating factors were

2    not found true by a jury beyond a reasonable doubt.  Dckt. No. 1 at 37-39.  He argues that if the

3    sentencing judge had relied only on his prior convictions, and not on the other factors, he may

4    have imposed only the middle term on these counts.  *Id.* at 38-39.

5         The California Court of Appeal denied this claim, ruling as follows:

6         **V. No Error in Imposition of Upper Term Sentences on Stayed**
          **Counts**

7
8         Defendant contends that the trial court erred in imposing the upper
          term for the stayed lesser related offense convictions for reasons
          other than a prior conviction or embodied in findings made by the
9         jury.  He argues that the statement of any such reason for imposing
          an upper term violates the federal jury trial guarantee, as explained
10        most recently in *Cunningham v. California* (2007) 549 U .S. ___,
          ___ [166 L.Ed.2d 856, ___] (*Cunningham*).  The Attorney General
11        replies that as long as the sentencing choice is warranted by a fact
          permitted under *Cunningham*, there is no error. In *Black II,* the
12        Supreme Court endorsed that view, and so, perforce, do we.

13        The trial court imposed the upper term on convictions of shooting
          from a motor vehicle, shooting at an inhabited dwelling, and street
14        terrorism, all of which were stayed.  It gave the following reasons
          for aggravation:

15
          "As to Count 2, which was a lesser, the Court has found the
16        following factors in aggravation:

17        "That the crime involved great violence, great bodily harm, threat
          of great bodily harm, or other acts disclosing a high degree of
18        cruelty, viciousness, or callousness;

19        "That the victim was particularly vulnerable;

20        "That the manner in which the crime was carried out indicated
          planning, sophistication, or professionalism;

21
          "That defendant has engaged in violent conduct, which indicates a
22        serious danger to society;

23        "And that his prior convictions as an adult or sustained petitions
          are numerous or of increasing seriousness."

24
          Defendant does not dispute that the latter-most reason is predicated
25        on facts that need not be submitted to a jury.  (*Black II, supra*, 41
          Cal.4th at pp. 818-820.)  He argues this is immaterial because it
26        cannot be determined whether the upper term would have been

                                      26

1  imposed without support from the other reasons given for selecting
   the upper term.  However, this argument has been overtaken by the
2  *Black II* opinion: "[I]mposition of the upper term does not infringe
   upon the defendant's constitutional right to jury trial so long as one
3  legally sufficient aggravating circumstance . . . is justified based
   upon the defendant's record of prior convictions." (*Id.* at p. 816.)
4  Thus, there was no *Cunningham* error in this case.

5  Opinion at 18-20.

6          In *Cunningham*, the Supreme Court held that California's Determinate Sentencing Law

7  violates a defendant's right to a jury trial to the extent it permits a trial court to impose an upper

8  term based on facts found by the court rather than by a jury. 549 U.S. at 291.[8]  In *Blakely*, the

9  Supreme Court decided that a defendant in a criminal case is entitled to have a jury determine

10 beyond a reasonable doubt any fact that increases the statutory maximum sentence, unless the

11 fact was admitted by the defendant or was based on a prior conviction. 542 U.S. at 303-04.

12 Under California law, only one valid aggravating factor need be found to authorize an upper

13 term sentence. *Butler*, 528 F.3d at 641; *Kessee*, 574 F.3d at 676 n.1 (9th Cir. 2009); *see also*

14 *Moore v. Evans*, No. 2:09-cv-2737-JFM (HC), 2010 WL 4290080, at *9 (E.D. Cal. Oct. 22,

15 2010); *Armstrong v. Small*, No. CV 07-1101 RGK (FMO), 2009 WL 863351, at *17 (C.D. Cal.

16 Mar. 30, 2009).  *See also Black II*, 41 Cal.4th 799; *People v. Osband*, 13 Cal. 4th 622, 728

17 (1996).  That is, only one aggravating factor is necessary to set the upper term as the "statutory

18 maximum" for *Apprendi* and *Blakely* purposes as long as it is established in accordance with the

19 constitutional requirements set forth in *Blakely*.  *Black II*, 41 Cal.4th at 812.  While the

20 sentencing court may make factual findings with respect to additional aggravating

21

22          [8]  The Supreme Court also determined in *Cunningham* that "the middle term prescribed in
   California's statutes, not the upper term, is the relevant statutory maximum."  *Id*. at 288.  The
23 California Legislature responded to this determination by amending California Penal Code
   § 1170(b) to vest sentencing courts with the discretion to impose the lower, middle or upper
24 terms without making specific factual findings, thereby making the upper term the maximum
   term under California law.  *See People v. Sandoval*, 41 Cal. 4th 825, 844-52 (2007).  The Ninth
25 Circuit has subsequently held that *Cunningham* "did not announce a new rule of constitutional
   law and may be applied retroactively on collateral review."  *Butler v. Curry*, 528 F.3d 624, 639
26 (9th Cir. (2008)).

1   circumstances, these findings, themselves, do not further raise the authorized sentence beyond

2   the upper term.  *Id.*

3          Furthermore, with respect to claims of *Apprendi* error, "the relevant question is not what

4   the trial court would have done, but what it legally could have done."  *Butler*, 528 F.3d at 648.

5   That the sentencing judge in this case might not have imposed an upper term sentence in the

6   absence of additional aggravating factors does not implicate the Sixth Amendment.  *Butler*, 528

7   F.3d at 649.  Rather, petitioner's upper term sentence on the enhancement is not unconstitutional

8   if at least one of the aggravating factors that the sentencing judge relied upon was established in

9   a manner consistent with the Sixth Amendment.

10          In *Almendarez-Torres*, 523 U.S. 224, 239-47 (1998), the Supreme Court held that the fact

11   of a prior conviction does not have to be determined by a jury before a sentencing court may use

12   the conviction as the basis for a sentencing enhancement.  Rather, prior convictions may be

13   found by the judge based on a preponderance of evidence.  *Id.* at 239-47.  *See also United States*

14   *v. Medina-Villa*, 567 F.3d 507, 520 (9th Cir. 2009) ("*Almendarez-Torres* remains good law").

15   Here, the California Court of Appeal concluded that, in imposing the upper term on counts 2 and

16   3, the trial court was entitled to rely on the fact of petitioner's record of prior convictions.  This

17   decision is consistent with *Almendariz-Torres* and therefore may not be set aside.  Because the

18   trial judge could have legally imposed the upper terms solely on the existence of petitioner's

19   prior convictions, his upper term sentence is not unconstitutional.

20          The court also notes that *Apprendi* errors are subject to harmless error analysis.

21   *Washington v. Recueno*, 548 U.S. 212 (2006); *Butler*, 528 F.3d at 648-49.  Petitioner is entitled

22   to habeas relief only upon a showing that the violation of his constitutional rights had a

23   "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S.

24   at 623.  Here, there is no doubt that a jury would have found petitioner was eligible for the upper

25   term based on his record of prior convictions.  There is also no doubt that a jury would have

26   ////

28

1  concluded beyond a reasonable doubt that the victim in this case was particularly vulnerable[9] and

2  that the crime involved violent conduct which posed a serious danger to society.  Accordingly,

3  any error by the trial judge in imposing the upper term based on these factors was harmless.

4  **III.  Conclusion**

5       Accordingly, for all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

6  petitioner's application for a writ of habeas corpus be denied.

7       These findings and recommendations are submitted to the United States District Judge

8  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one

9  days after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

12  within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

13  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

14  his objections petitioner may address whether a certificate of appealability should issue in the

15  event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing

16  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

17  enters a final order adverse to the applicant).

18  DATED:  January 5, 2012.

19                                    _____
                                      EDMUND F. BRENNAN
20                                    UNITED STATES MAGISTRATE JUDGE

21

22

          _____

23      [9]  Under California law, vulnerable means "'defenseless, unguarded, unprotected,
     accessible, assailable, one who is susceptible to the defendant's criminal act.'"  *People v.*
24   *Weaver*, 149 Cal.App.4th 1301, 1314 (2007) (quoting *People v. Smith*, 94 Cal.App.3d 433, 436
     (1979)).  A victim is "particularly" vulnerable if he is vulnerable to a "special or unusual degree,
25   to an extent greater than in other cases."  *People v. Loudermilk*, 195 Cal.App.3d 996, 1007
     (1987).  Here, the 21 year old victim was riding a bicycle and was defenseless against a car full
26   of men with guns.  He was therefore vulnerable "to an extent greater than in other cases."  *Id.*

                                              29